May it please the Court. My name is Joseph Daly for the Lee Plaintiff. West Virginia Investment Management Board. With me at council table is my partner, Tor Gronborg. Your Honors, I'd like to reserve five minutes of my time for rebuttal. Just keep an eye on the clock. I will. This morning I'd like to focus on three things, Your Honors. The District Court's error in discounting the consistent, corroborative accounts of the numerous confidential witnesses. The falsity of the defendant's statements and omissions regarding Adecco's financials and financial state. And third, under the Supreme Court's recent tell-labs decision, why the alleged facts considered holistically and collectively combined to raise a strong inference of the defendant's seantor. Turning to the confidential witnesses, this Court in the Dow case said that confidential witness accounts will suffice so long as they are described with sufficient particularity to support, quote, the probability, end quote, that a person in that position would possess the information alleged. Not proof, just probability. And just sufficient particularity, not exhaustive particularity. And I believe here that we've more than met that standard. Where do you show here that the defendants knew, prior to writing off these millions of accounts receivables in 2003 and 2004, that indeed the receivables were uncollectible? It seems to me that they might very well have been collectible. It seems that they might have been collectible? Where do you show that, A, they were uncollectible, that it was false, and two, that they knew that they were uncollectible? These were, you know, collectibles with major corporations, Kodak and other people. IBM? Exactly. And the major corporations you mentioned are the very same corporations that some of our confidential witnesses have told us. The problem is that, as I said, that, you know, when you get your act together, come back to us. But, you know, wasn't this really a simple case where the defendants were just, you know, involved in poor management techniques? And I just don't see the proof of uncollectibility here. They may well be collectible. Well, let me try to help Your Honor see that. The uncollectibles that Your Honor mentioned, Kodak, Prudential, AIG, these collectibles were on the books for years. That is not standard business practice. We've got confidential witness after confidential witness that say to a person that soon after the merger with Olson in 2000, the problem of the millions of uncollectible receivables was apparent. There was a merger of these corporations. There was poor bookkeeping, poor accounting, all this type of stuff here. But so what? I mean, by the way, were they ever collected afterwards? Did Kodak ever pay up or these other companies? I don't know, Your Honor. Could be yes, could be no. It's not in the record. So you have to show, A, that, you know, they were absolutely uncollectible and that the defendants knew they would be uncollectible. No, that's the wrong standard, Your Honor. It is not whether, it is not that they are absolutely uncollectible. Under GAAP, under paragraph, pardon me, under FASB 5, paragraph 8, all that needs to be shown is the probability, the likelihood that Well, you've got the strong inference standard you have to deal with. Well, I've got the strong inference standard of the defendants' knowledge that this is going on. We've got confidential witnesses at the executive level within this company that are telling us that Swiss headquarters knew of this problem, that the problem was discussed as early as February 2001 at a meeting in Melbourne, New York See, I agree that there was a problem. All right. No question about it. Agreed. But I think you have to do more than that. You have to show that these accounts were actually not collectible, that they knew they were not going to be collectible. As if, for example, there was a bankruptcy and there's no question that people knew that these monies were never going to be collected. But that's not this case. But, Your Honor, I believe that discounts the testimony, the recollections of these 17 confidential witnesses, which, again, almost to a person, said that beginning very early in the class period, it was clear that there were millions of uncollectible receivables. You had all these problems. You had to do something with that. But I don't know where you'd jump from that to tell me that these receivables from Kodak and all these other companies were uncollectible. Well, Judge Block, I would suggest that when you look at the totality of the case, not just the accounts of the confidential witnesses, let's look at some other things. Let's look at the $100 million write-off halfway through 2003. Let's look at the resignation of the top executives responsible for these financials. Let's look at the fact that the market punished Adeko's stock to the tune of $6 billion. It was a bad job. They were just an inefficient operation. Well, not only did they do a bad job, but at the same time, they were speaking to the market, telling the market what a good job we were doing. It would be a different story, Your Honor, if they had consistently said throughout the class period, you know, we've got these $100 million in collectibles, uncollectible receivables hovering around in the background. While we're telling you how great our revenues are going, when we tell you how good our bottom line is going, you need to take that with a grain of salt. Because, by the way, we've got $100 million in uncollectible receivables over here. And, by the way, we've only reserved 30 million euros in that particular year for those 100 million. I mean, that's where you start getting the indicia of scienter here. You've got a meeting in Melville. I'm going to refer back to that meeting because it's a very important meeting. It's a meeting in Melville, New York, at the new headquarters of the new company. The CFO of the company is present at that meeting, Mr. Weber. He is there, and these receivables are discussed as a major concern for the Swiss headquarters. You've got the director of the treasury, one of our witnesses, confidential witness number 11. Do you know that they were uncollectible? Again, it only has to be the probability that they are uncollectible. It doesn't have to be set in stone. You get this concept of a probability of uncollectibility is triggering, you know, securities, fraud, civil litigation. I get that directly from generally accepted accounting principles, Your Honor. FASB-5 says that What was wrong with the accounting principles here? I mean, where were they deceptive? Where did they do something that was contrary to accounting principles? They knew that these receivables had been on the books for years, sometimes dating all the way back to 1999. Fast forward to 2001, 2002. Those receivables are still on the books. Generally accepted accounting principle says you cannot do that. If you're going to keep them on the books, you need to have a corresponding reserve for that, and they did not. So all these defendants knew that these were accounts receivables that were on the books all the way back then? When you say all these defendants, there are really only four individual defendants plus the company itself, and these were the people at the upper, the highest echelons of the company. But they are also the people responsible for preparing the company's financials and disseminating them to the market. These are the individuals that are on the conference calls. These are the individuals that are signing the financials. They have an obligation under GAAP and under the securities laws not to be reckless in putting forth that information into the market. As I said, we have the Director of Treasury. Just explain to me, because I'm not an accountant. When do you decide at the GAAP when you should deem an account receivable as uncollectible? Isn't there some business judgment entailed in that decision? Is there a particular time when you're supposed to say something is uncollectible? Here's why it's uncollectible. Just how does that work out? That particular provision of GAAP, again, FASB 5, paragraph 8, and I have it on the table. I can quote from it. But to the best of my recollection, it has two prongs. Number one, when it becomes probable, and the accounting board defines probable as likely. When it becomes likely that that amount is going to be uncollectible and when the amount can be reasonably estimated. When that happens, you need to accrue for that loss immediately in the quarter that it's happening, at the time that it's happening. There seems to be a lot of flexibility, a lot of business judgment that's entailed in making those discreet determinations. Well, I know that's the defendant's. Well, it's not the defendant's. It just seems common sense to me. There has to be some play in the joints here. But what goes from business judgment and judgment calls and things like that, it becomes securities fraud. When you have enough information telling you that what you're telling the market is perhaps misleading. The standard here is not absolute knowledge, Judge Block. It is merely recklessness. I'm not saying it was. Well, it sounds as though you want them to know to an absolute certainty. I didn't say that. I'm sorry. And I apologize. I thought my questions were focused on what I was concerned about. But go ahead. I'm sorry if I created a false impression. All right. I don't want to be sued for security fraud. I really don't know what more I could say about just the flavor of the collectibles themselves, the accounts receivable. Other than that, when you have enough indicia coming into the executive suites that those. Were any of these confidential informants in the executive suites in Europe? Themselves? In Europe? Yeah. No. No. When you use the term executive suite, how are you using it? I'll say in this case there are two. There's the Swiss executive suites comprised of Mr. Kaye, Mr. Weber, Mr. Bomer. And then there is the ADECO North America, the largest subsidiary of the larger Swiss company, all right, fully one quarter of its revenues. And within those executive suites, I think it's fair to say that our confidential witness number 11 sat in those suites. He was the director of treasury for the entire United States. But how about for Switzerland? I mean, wasn't there a disconnect between the U.S. and Switzerland? You have these different headquarters. No. No, Your Honor. Knowledge based upon the U.S. people? We point out how Mr. Bomer and Mr. Weber had offices both in California and traveled to Melville, New York. One of the confidential witnesses tell us that the financials on a weekly basis were sent back to Switzerland in an Excel spreadsheet. But that just tells you about the size of the receivables, nothing about their collectability. But when you have a February 2001 meeting at which people at the meeting are telling the Swiss executives, we've got a big problem with accounts receivable, that provides them with some knowledge. We've got the director of treasury of North America going with hat in hand to the Swiss regularly, he says, regularly asking for short-term cash loans to tide ADECO North America over the cash shortfall, sometimes loans of $10 million at a pop. And when he does that, our brief explains, when he does that, he has to explain exactly why there's a cash shortage. And the reason for the cash shortage is these uncollectible receivables. It's a very simple ---- Did he explain that to the Swiss people, exactly as you say? I don't know how exactly he explained it, but that particular part of the ---- You're surmising that this must have happened to him. No, no, no. I'm sorry. I apologize if I misstated that. No. My brief in the leave to amend section explains how he has explained to our investigators that he would have to explain to the Swiss exactly why the cash was needed. And included within those explanations was a very large problem with accounts receivable, the misapplication of monies to the wrong accounts, et cetera. You said you identified from a confidential witness number 11 who was in the executive suites of North America. Right. I'm assuming a director of treasury would be saying that. So you alleged in the complaint that CW11 reported that ADECO had difficulty collecting outstanding receivables and applying payments collected from customers to the proper invoices and matching up the receipts. That's correct. And we don't own ---- So that just tells us that what he's alleging is that they had difficulty collecting them. Well, that's one facet, again, of the entire ---- That's what you wrote. Somebody wrote this. I'm not ---- CW11 further reported that ADECO North America's accounts receivable problem was the largest area of difficulty. So here you allege it was a problem during the class period. CW11 reported that ADECO did not have an automatic payment system in place in the corporate America office to match payments received from customers corresponding to corresponding accounts receivable. This resulted in large, uncollectible account receivables during the class period. That's exactly right. So one could infer from that, just as you might suggest it infers fraud, or that they knew they were uncollectible, that it was just poor management. But don't forget, we have another allegation in the complaint, that Ernst & Young, the new accounting firm that ---- That comes along several years later, right? It comes along in early 2003. Ernst & Young comes in after Arthur Anderson, after Arthur Anderson ---- The main focus of the complaint until we get to Ernst & Young is the 2001-2002 period, right? Agreed. 2000-2001-2002. And then Ernst & Young comes in at the end of 2002. Exactly. And then in 2003, they put them on, they begin to tell them, you know, you better get this cleaned up. In very early 2003. But you've made the link, Your Honor, Judge Paez. Ernst & Young comes in and tells the defendants the exact same thing that I say our witnesses ---- Now, by that time, hadn't they already accounted for some of the losses? No, the write-off happens in mid-2003. The $100 million write-off happens in summer of 2003. And there was another one in 2004. And there was another $35 million then. So let's remember, Ernst & Young comes in in early 2003 and says, guys, you've got to clean these books up. Your internal controls are not working. You're misapplying new monies to old receivables. That does not comport with GAAP. And we cannot ---- So what statements did they make after Ernst & Young appeared on the scene? Ernst & Young in 2003, early 2003, does the warning. Within a few months of that, the CFO, I'm sorry, April 15th. In filings or in press releases? In a conference call. In a conference call with? Analysts, the market. Chief Financial Officer Weber says that we now have, quote, even stronger controls over accounts receivable. Chief Executive Officer Kaye claims that the amount of losses is very low. Well, what happens within a month of those positive statements to the market? ADECO writes off $100 million in receivables. And how did the market react to that? I don't know. It's not in the complaint. Did you draft the complaint? No. I'm in our firm's appellate department, so I get the hand of cards that it's dealt to me. But we don't know what happened. It's not alleged what happened to that? Did the market? It's not alleged in the complaint. To my knowledge, it's not alleged in the complaint. So what do we infer from that? Well, this court in America West said that there's not always a bright line. There's no bright line rule that a stock has to react immediately to negative news. So how many months later was it that the stock finally? Well, it was in January of 2004 when ADECO makes what for most investors is a blockbuster announcement, which is we have to delay the filing of our 2003 financials. We have discovered material internal control weaknesses, et cetera. I just want to back up for one second to what Ernst & Young had told them at the beginning. They come out with these positive statements in April. Everything is great. Losses are low. But they're still committing the fraud. By the end of that year, Ernst & Young comes in and says, we're not going to let our head auditor, our lead auditor, sign off on your financials. You still haven't fixed the problem. In fact, and even after that blockbuster January 2004 announcement, when the new management comes in, okay, we've got a couple of resignations, when the new ADECO overall management comes in, they then commission $120 million investigation of the entire thing. So not only do we have $135 million in written-off receivables, not only do we have regular visits, maybe they're telephonic, I don't know if they're telephonic, or flying over to the Swiss headquarters for cash infusions into the company, we have the company spending another $120 million just to investigate what had happened under the watch of these previous defendants. I'd like to reserve the remainder of my time. All right. Thank you. Good morning, Your Honors. May it please the Court. Laurie Spilan from Latham & Watkins representing the defendants. One of the things about this case that creates the discontinuity is that the events that led to this lawsuit really have nothing to do with the current claims. In January 2004, the company announced that there would be a potential delay in its 2003 financials because of issues concerning internal controls, which Mr. Daley was talking about. As a consequence of that blockbuster announcement, as he describes, that the stock price predictably fell and plaintiffs predictably filed suit, predicting the worst. They predicted that there was going to be a massive fraud that would be detected and that the company would have to restate its financials. And as we know, none of that happened. The prophecy of doom never materialized and, in fact, after an extensive and expensive investigation and an exhaustive audit by Ernst & Young, ADECO timely filed its 2003 financials. Its accounts were signed off by its auditors with no qualifications, no restatement of prior year results, including 2000 and 2001, and no evidence of any material irregularities. What do you take from Ernst & Young's advisement? About the weaknesses in internal controls? Well, you know, I think it makes sense to think about the chronology here. ADECO is a Swiss corporation and foreign private issuers have a different periodic reporting schedule than U.S. companies. So they report their results in June for the year ended previously. Before those financial results are filed in the United States, however, ADECO provides information to the analysts and its investors across the world about what its financial results were. And in connection with those announcements, they announced that they were going to be taking a $100 million charge for uncollectible receivables primarily at their North American subsidiary. So that information was in the market. Now, not surprisingly, when you take a $100 million charge, and even though ADECO is a $19 billion annual revenue company, it's still not an insignificant number, the auditors are going to say, well, there was a weakness in your internal controls that allowed this to happen. And I think we all can see this, as Judge Block was noting, that this company had problems. In 2000, it acquired Olson, another very large human resources provider, predominantly located here in the North American continent. And as often happens with mergers, they had difficulties in integrating the two companies, and particularly in integrating the two systems. ADECO and Olson provided temporary employees to a lot of the same big customers, to IBM, to Kodak, AIG, companies that, as you know, are not ones that you expect to file for bankruptcy and not in typical circumstances pay their accounts. And so they had difficulty then in matching up. Olson would send an invoice to AIG, but ADECO would have one, and because they were having difficulty getting the computers to talk, they sometimes misapplied the payments that came in for one invoice to another invoice. And it was a real problem. We don't know why you say because they were having difficulty getting. What we know is that they applied new money to old accounts. Right. That's the allegation. Correct. But if you look at the allegations of the complaint, what the plaintiffs tell you about the case, sorry, is that all of these problems were due to difficulties. They describe them as difficulties and problems. This is what their confidential witnesses say. We had difficulties in integration and conversion to Olson Computer Systems. That's the plaintiff's witnesses. There were difficulties in matching the customer payments with corresponding invoices, and this led to unapplied or misapplied cash. And after a while, when you haven't been able to collect the accounts, some of the customers become unable to pay and some of the customers become unwilling to pay because you can't tell them which invoice relates to which payment. And that, in turn, led to write-offs in 2002 of $100 million. But as the court has observed, I mean, these are benign facts. They're problems with integration systems, and the plaintiffs haven't provided any basis for us to believe that either they were anything other than mismanagement or poor judgment or poor systems or internal control weaknesses, which isn't securities fraud, as opposed to unknowing manipulation or deliberate failure to take accounts receivable reserves at an appropriate time by the senior executives in Zurich. You know, the fact that, of course, we took a charge is not any evidence at all that anyone knew at any prior point in time that those accounts were not collectible. And you asked about the standards. Well, under GAAP and under the case law applying GAAP, assessments concerning the collectibility of accounts receivable require judgments and estimates, which must be and are constantly re-evaluated and are reflected as current period charges, not restatements of past errors, but current period adjustments if additional information or changes in circumstances occur. So if you have an account on the books at one period and you think you can collect it, then you don't necessarily take a reserve or write-off against it. You don't. But if later you determine that, in fact, it's unlikely or unprobable that you're going to collect that reserve, you take that charge then in that period and you don't restate. And the fact that Ernst & Young didn't require any restatement of the prior year's accounts I think vitiates any inference on their part after this exhaustive audit and investigation that those write-offs should have occurred earlier. In the ICN case, the Central District of California, a delinquent write-down of the impaired asset without anything more does not state a claim of securities fraud, stating at best a bad business decision. And, you know, as was famously stated in the Daleo case in the Seventh Circuit, I mean, if all you have is a dispute about when a write-off should have occurred in one period or another, then you may have negligence, but you certainly don't have fraud. And it's the same with respect to the prior reserves. It's the flip side of the coin. The reserves proved insufficient in hindsight does not prove that they were known to be inadequate at any prior time. Again, reserve contingencies reflect judgments based on current information, and when new or better judgment is acquired, then GAAP requires that you increase those reserves or take charges against the inadequate provisions in the period when that's determined. Now, there are no particular documents. What do we do with the confidential witnesses that are alleged? Exactly. So the only thing that the plaintiffs have to support this fraud by hindsight observation that we ultimately have to take a write-off are the confidential witnesses. There are 17 confidential witnesses. Every single one of them is in the North American subsidiary. Not one of them is in Zurich. Not one of them even alleges that they ever talked to any of the defendants, that they met them, that they sat in a meeting with them. The meeting that we hear about is hearsay. Not one of those confidential witnesses attended it. And in any event, it's a meeting where supposedly the CFO expressed some concern about the collection of receivables, which you would hope that a CFO would do. The confidential witnesses were not accountants. They weren't in the accounting department. There's absolutely no reason. How about the one who alleges that he was the treasurer? Well, he alleges that he was the treasurer, but we're not told what those responsibilities are. What we are told is that we're told what the reporting chain is, that people in the collections department, so these are low-level people calling up and dunning accounts for not paying, reported to him that they were having problems, and then he in turn reported to the CFO of North America, who in turn reported to the treasurer in Switzerland, who in turn reported to the CFO in Switzerland. The confidential witnesses identify accounts that aggregate $1 million. This is a $19 billion company. To think that that $1 million worth of accounts that these confidential witnesses are talking about came to the attention of the senior executives is highly improbable, which is not to say that they weren't concerned about improving collections, but the idea that the plaintiffs have identified anything or any basis to believe that these defendants in Zurich had any idea about these issues prior to the write-off just simply has no basis. I agree with the plaintiffs in terms of the standard for assessing the reliability of confidential witnesses. It is the standard that's set forth in Dow that confidential witnesses must be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged, and the plaintiffs have not done that here because the confidential witnesses are low-level employees with no contact with the accounting decisions that led to the ultimate write-offs or the decisions not to write off those accounts in earlier periods and have no connection with and cannot link any of the senior executive defendants in Switzerland with the accounting problems in the North American subsidiary. Let me ask you one other question. One of the things they raised was that I think they asked the district court for leave to amend. They did, Your Honor. And the district court said no. This was their third complaint. Once was enough or whatever. Well, this was their third complaint. After they filed the initial complaint because of the delay in the financials in 2003, they filed a new amended complaint that dealt with the write-off in 2002 claiming that it should have been earlier. The district court wrote a very careful opinion looking at the totality of the circumstances in light of Dow, which was Judge Lorenz's decision as well, and determined that they hadn't pled a strong inference of ciander but told them what they needed to plead if they wanted to cure the deficiencies of their complaint. When they filed their new complaint, it was just more of the same. There were a couple of new confidential witnesses at the same low levels, not in the accounting department, who provided similar hearsay speculation and snippets of gossip that the defendants in Zurich must have known because this was a big problem, extrapolating from the $1 million in identified accounts that they must have known that the $100 million write-off would ultimately be required. So I think that because this Court's decision hold that where they've had multiple opportunities to amend, and they've offered nothing new, and they've offered nothing to the district court, on appeal they've made a couple of issues, including the unpled allegation that there was this witness who had to explain the reasons he needed to borrow money from the inter-company accounts on a daily basis. That's not pled, that's something that they want to submit, but frankly it doesn't matter. It really doesn't demonstrate any scienter on the part of the individual defendants. There's one case where this Court has reversed the Court on a dismissal of a securities fraud case by virtue of failing to give leave to amend. That's Eminence Capital. And in the Eminence Capital case, there was an evolving situation. The plaintiffs were able to point to the fact that a special investigation was about to be concluded and that they expected that once that special investigation was done that there would be new facts that could be brought to bear on the sufficiency of their allegations, and this Court felt that they should have been given that opportunity. Here the investigation, the plaintiff's complaint was so expensive but found no fraud, was concluded in June of 2004. There's no new facts that plaintiffs can provide to cure the deficiencies of the complaint, and therefore the district court was completely within its discretion in not allowing further amendments. Thank you, Your Honors. Thank you. Thank you, Your Honors. Four quick points. Number one, counsel speaks of this exhaustive investigation that didn't turn up anything unusual about 2000-2001. The complaint alleges, excerpt of Record 59, Paragraph 8, that Ernst & Young was never asked to look at 2000 and 2001. They didn't go back and look at them. So, of course, there was nothing said by Ernst & Young because they didn't go back that far. Second point, as far as confidential witnesses, I think she used the term smoking gun, meetings, or maybe, I'm sorry, that's probably my turn. She wants meetings. She says it's all hearsay. Well, of course it's hearsay. At this point, it's the pleading stage. We have to accept these pleaded facts as true. Justice Ginsburg, in the Telabs case, notes specifically that we don't need any smoking gun pieces of evidence in order to plead a strong inference of standard. We just go back to that holistic collective standard. Number three, this counsel's euphemistic recitation of difficulties that arose after the Olson merger. Well, I would like to just read some of the specific difficulties, to Your Honors, just so you know that the complaint does put these down with particularity. At paragraph 52E, again, that's ER 59. At paragraph 52E, confidential witness number five says that corporate disseminated monthly operating reports reflecting collections, billables, age trial reports, et cetera. The reports continually revealed outstanding receivables. The outstanding collections were awful. The company had no centralized depository for customer contracts, billing rates, pay rates, or other placement-related information. This particular witness knows that Deutsche Bank was 360 days past due on over $100,000 and that Kodak was 180 days past due on approximately $200,000. Judge Block, I would like to point your attention to the Dow case from this circuit. You were earlier describing the gap violations as maybe just the ebb and flow in the ordinary business of a company. But this court in the Dow case said that when significant gap violations are described with particularity, they may provide powerful indirect evidence of scienter. Quoting a district court case, it said, after all, books do not cook themselves. And I would last point out that counsel was using the terms knowing and deliberate, that there had to be some sort of knowing and deliberate decision on behalf of the named defendants here to cook the books. That is not the standard. These are historical statements. The standard is only recklessness. If the information coming into the Swiss executive suites and coming in through spreadsheets communicated to them weekly from the North American headquarters showed that there was a huge problem with collectibles, and they ignored that, that is recklessness. And their statements to the market were knowingly reckless. If Your Honor has no further questions. I don't need a question, but when you talk about huge, do we compare the amount of the write-off to the amount of income that is normally generated? And if we do, is $100 million considered huge when you're dealing with a $19 billion company? Two responses to that. Number one, I don't believe this panel, as a matter of law, can decide whether a specific figure is immaterial. But you suggested huge, and I wanted to know what you meant when you wanted us to talk about huge. But counsel, speaking of the million dollars in documented, in specific witnesses saying, okay, $200,000 here, $100,000 here, I think it's fair to say if we only got our hands on 17 confidential witnesses at a few of the several 1,500 offices across the United States and were able to plead that much of a problem, that combined with the $135 million write-off shows you that the problem was indeed huge. Thank you, counsel. Thank you, Your Honor. The matter will be deemed submitted. We appreciate counsel's argument. And we're going to take up the next case, which is Laron. But before we, Laron group versus Paragin. We need to take a five-minute, the court needs to take a five-minute recess because one of the lawyers is going to make an appearance telephonically, and the clerk needs to contact him and get him set up. And as soon as that's done, we're going to resume. So don't go far. All right. Counsel's court will take a short break. Thank you. Good morning. Good morning. I'm calling for Kim Johnson, please. This is Kim Johnson. Good morning, Kim. This is Caleb Goff from the United States Court of Appeals in Pasadena. Hi. You're live in the courtroom now, and session will begin momentarily. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Farris, Paez, Block